Case No. 24-3195

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

American Medical Response of Inland Empire

*Plaintiff and Appellant,*

v.

County of San Bernardino, County of San Bernardino Board of Supervisors, and Inland Counties Emergency Medical Agency

*Defendants and Appellees,*

and

Consolidated Fire Agencies

*Real Party in Interest.*

From The United States District Court,
Central District of California
Case No. 5:24-cv-00267-KK-SP
Hon. Kenly Kiya Kato

## ANSWERING BRIEF OF DEFENDANTS-APPELLEES

**HOOPER, LUNDY & BOOKMAN, P.C.**
Katrina A. Pagonis
Jordan Kearney
Devin M. Senelick
Erin R. Sclar
44 Montgomery Street, Suite 3500
San Francisco, California 94104
Telephone: (415) 875-8500
Email: kpagonis@hooperlundy.com

Attorneys for Defendants-Appellees

## <u>TABLE OF CONTENTS</u>

<b><u>Page(s)</u></b>

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION.......................................................3

ISSUE PRESENTED FOR REVIEW .....................................................3

STATUTORY ADDENDUM .................................................................3

STATEMENT OF THE CASE................................................................4

    I.     Facts of the Case....................................................................4

          A.     Legal Authority ...........................................................4

               1.     The EMS Act ...................................................4

               2.     County Policy Manual and Procurement Manual ...........8

          B.     ICEMA's Competitive Process, Utilizing the Best Value Evaluation Methodology.................................................9

               1.     The RFP .........................................................10

               2.     The Evaluation and Contract Selection ..........................12

    II.    Procedural History................................................................15

    III.   California Superior Court Proceedings ...............................17

SUMMARY OF THE ARGUMENT ....................................................18

STANDARD OF REVIEW ..................................................................20

ARGUMENT .......................................................................................21

    I.     The District Court Properly Applied State-Action Immunity Because the County's Exclusive Agreement for Emergency Medical Services is Precisely Contemplated by the EMS Act. ..........22

    II.    AMR's Arguments to the Contrary are Unavailing. ...........................31

          A.     AMR's Attempt to Escape State-Action Immunity by Asserting a Procurement Violation is Unavailing. ...................32

          B.     AMR Cannot Allege that County Appellees Acted Outside the Bounds of the EMS Act........................................38

                1.     AMR's Argument Erroneously Conflates the Voluntary Submission of an RFP with the Submission and Approval of the EMS Plan Itself..........40

i

# <u>TABLE OF CONTENTS</u> (cont.)

<u>Page(s)</u>

2. County Appellees Did Not Violate or Act Outside the Bounds of the RFP....................................43

CONCLUSION....................................................................................46

STATEMENT OF RELATED CASES ..................................................47

CERTIFICATE OF COMPLIANCE....................................................48

CERTIFICATE OF SERVICE ............................................................49

STATUTORY ADDENDUM ...............................................Addendum 1

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*A-1 Ambulance Svc., Inc. v. Cnty. of Monterey*,
90 F.3d 333 (9th Cir. 1996) .............................................................2, 19, 22, 28

*Boone v. Redevelopment Agency of City of San Jose*,
841 F.2d 886 (9th Cir. 1988) ....................................................................*passim*

*Chamber of Com. v. City of Seattle*,
890 F.3d 769 (9th Cir. 2018) ...............................................................................28

*City of Columbia v. Omni Outdoor Advert., Inc.*,
499 U.S. 365 (1991)...................................................................................*passim*

*Community Communications Company, Inc. v. City of Boulder, Colorado*,
455 U.S. 40, 70 L. Ed. 2d 810, 102 S. Ct. 835 (1982) ................................26, 28

*Cost Mgmt. Servs. Inc. v. Wash. Nat. Gas Co.*,
99 F.3d 937 (9th Cir. 1996) .................................................................................29

*Ellis v. Salt River Project Agricultural Improvement & Power District*,
24 F.4th 1242 (9th Cir. 2022) .......................................................................29, 30

*FTC v. Phoebe Putney Health Sys., Inc.*,
568 U.S. 216 (2013)........................................................................................22, 24

*Grason Elec. Co. v. Sacramento Mun. Utility Dist.*,
770 F.2d 833 (9th Cir. 1985) ...............................................................................20

*Hoover v. Ronwin*,
466 U.S. 558 (1984)........................................................................................23, 36

*Kay Electric Co-Op v. City of Newkirk*,
647 F.3d 1039 (10th Cir. 2011) ...........................................................................30

*Kern-Tulare Water Dist. v. City of Bakersfield*,
828 F.2d 514 (9th Cir. 1987) ...............................................................................38

## **TABLE OF AUTHORITIES** (Cont.)

**Page(s)**

*Lancaster Comty. Hosp. v. Antelope Valley Hosp. Dist.*,
940 F.2d 397 (9th Cir. 1991) ........................................................29, 35

*Llewellyn v. Crothers*,
765 F.2d 769 (9th Cir. 1985) ......................................................*passim*

*Mercy-Peninsula Ambulance, Inc. v. San Mateo Cnty.*,
791 F.2d 755 (9th Cir. 1986) ......................................................*passim*

*N.C. State Bd. of Dental Exam'rs v. F.T.C.*,
574 U.S. 494 (2015).................................................................24, 43

*Parker v. Brown*,
317 U.S. 341 (1943).......................................................23, 27, 33, 43

*Parks v. Watson*,
716 F.2d 656 (9th Cir. 1983) ...........................................................29

*Redwood Empire Life Support v. Cnty. of Sonoma*,
190 F.3d 949 (9th Cir. 1999) .........................................2, 18, 22, 28

*S.E.C. v. Internet Solutions for Business Inc.*,
509 F.3d 1161 (9th Cir. 2007) .........................................................39

*Town of Hallie v. City of Eau Claire*,
471 U.S. 34 (1985).....................................................................*passim*

*Traweek v. City and Cnty. of San Francisco*,
920 F.2d 589 (9th Cir. 1990) ......................................................*passim*

### STATE CASES

*Cnty. of San Bernardino v. City of San Bernardino*,
15 Cal.4th 909 (1997) ..............................................................4, 5

*Eel River Disposal & Res. Recovery, Inc. v. Cnty. of Humboldt*,
221 Cal. App. 4th 209 (2013) ..........................................................45

*Michael Leslie Prods., Inc. v. City of Los Angeles*,
207 Cal. App. 4th 1011 (2012) ........................................................45

iv

# TABLE OF AUTHORITIES (Cont.)

**Page(s)**

*Mike Moore's 24-Hour Towing v. City of San Diego*,
    45 Cal. App. 4th 1294 (1996) ...................................................................45

## STATE STATUTES

California Health & Safety Code
    § 1757.........................................................................................................4
    § 1797.1......................................................................................................4
    § 1797.6...................................................................................8, 19, 26, 31
    § 1797.6(b)...............................................................................................27
    § 1797.76............................................................................................5, 41
    § 1797.78...................................................................................................5
    § 1797.85............................................................................................*passim*
    § 1797.90...................................................................................................5
    § 1797.100.................................................................................................4
    § 1797.103..........................................................................................5, 41
    § 1797.105(b).....................................................................................6, 41
    § 1797.200..........................................................................................4, 5
    § 1797.204...................................................................................6, 27, 30
    § 1797.224...........................................................................................*passim*
    § 1797.250...................................................................................5, 27, 41
    § 1798.......................................................................................................5
    § 1798.100.................................................................................................5

## FEDERAL RULES

9th Circuit Rule 28-2.7 ........................................................................................3

Federal Rule of Civil Procedure 28(f) .................................................................3

## CONSTITUTIONAL PROVISIONS

California Constitution Article XIII C....................................................................16

# INTRODUCTION

American Medical Response of Inland Empire ("AMR") was an unsuccessful bidder for an exclusive contract for emergency medical services ("EMS") in San Bernardino County ("County"). Disappointed with the outcome, AMR filed suit in Federal court seeking to subject Appellees County, Inland Counties Emergency Medical Agency ("ICEMA"), and San Bernardino County Board of Supervisors ("Board") (collectively "County Appellees") to Federal antitrust liability. In doing so, AMR did not dispute that California law authorizes exclusive contracting with EMS providers. Instead, AMR contends that it was unlawful for County Appellees to not award the exclusive contract to AMR. This lawsuit—a dressed up procurement claim—is barred by binding precedent that AMR cannot overcome (and often wholly fails to even present to this Court).

Decades ago, the Federal courts encountered and resolved a range of questions concerning the reach of the Sherman Act and the exercise of state sovereignty to displace competition. *First*, the Supreme Court confirmed that municipalities are insulated from liability under the Sherman Act for anticompetitive acts authorized by a clearly articulated state policy without the need for active state supervision. *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 46–47 (1985). *Second*, this Circuit expressly confirmed that California satisfied this clear articulation requirement when it authorized municipalities to

1

displace competition in the area of emergency medical services ("EMS"), including through exclusive contracting with EMS providers for services in exclusive operating areas. *Redwood Empire Life Support v. Cnty. of Sonoma*, 190 F.3d 949, 953–54 (9th Cir. 1999); *A-1 Ambulance Svc., Inc. v. Cnty. of Monterey*, 90 F.3d 333, 336 (9th Cir. 1996); *Mercy-Peninsula Ambulance, Inc. v. San Mateo Cnty.*, 791 F.2d 755, 758 (9th Cir. 1986). *Third*, the Ninth Circuit and later the Supreme Court held that allegations of illegality, bad faith, or even conspiracy on the part of such a municipality do not limit the authorization under state law or otherwise erode state-action immunity. *City of Columbia v. Omni Outdoor Advert., Inc*., 499 U.S. 365, 371–79 (1991); *Traweek v. City and Cnty. of San Francisco*, 920 F.2d 589, 592–93 (9th Cir. 1990); *Boone v. Redevelopment Agency of City of San Jose*, 841 F.2d 886, 891–92 (9th Cir. 1988); *Llewellyn v. Crothers*, 765 F.2d 769, 774 (9th Cir. 1985).

AMR nonetheless argues that the district court erroneously dismissed its Sherman Act claim as foreclosed by state-action immunity.  According to AMR, County Appellees violated state law when they negotiated an exclusive contract with AMR's competitor, Real Party in Interest Consolidated Fire Agencies ("CONFIRE").  Even assuming this is true, *Omni*, *Traweek*, *Boone*, and *Llewellyn* confirm that allegations of illegality do not overcome state-action immunity.  Rather, the proper forum for this procurement dispute is state court—and in fact,

the state court granted AMR a preliminary injunction barring implementation of the challenged exclusive contract. Moreover, AMR's assertions of illegality are simply erroneous and would improperly displace the statutory process for review of EMS plans and processes (California EMS Authority review) with a process of Federal litigation.

In light of the foregoing, County Appellees urge this court to affirm the district court's dismissal with prejudice and to decline AMR's invitation to interfere with California's EMS planning system.

## STATEMENT OF JURISDICTION

County Appellees agree with the Jurisdictional Statement contained on pages 3 and 4 of AMR's Brief, submitted on July 31, 2024, ECF No. 10.

## ISSUE PRESENTED FOR REVIEW

Whether the district court was correct in holding that state-action immunity applies to the award of an exclusive contract for emergency medical services authorized under California law when the plaintiff alleges the award was unlawful or legally deficient.

## STATUTORY ADDENDUM

All relevant statutes are reproduced in County Appellees' addendum, attached hereto. *See* 9th Cir. R. 28-2.7; Fed. R. Civ. Proc. 28(f).

## STATEMENT OF THE CASE

County Appellees developed a competitive process to select a new ambulance provider for an exclusive five-year contract with the County. 4-ER-659. AMR and CONFIRE each responded to the Request for Proposals ("RFP"). 4-ER-664. County Appellees evaluated the proposals using a "best value" methodology, ultimately awarding the contract to CONFIRE. AMR filed suit alleging that the award of the exclusive contract to CONFIRE instead of AMR is actionable against County Appellees under section 1 of the Sherman Act.

## I. Facts of the Case

### A. Legal Authority

#### 1. The EMS Act

The Emergency Medical Services System and the Prehospital Emergency Medical Care Personnel Act ("EMS Act"), Cal. Health & Safety Code §§ 1757 *et seq.*, governs the provision of EMS, including ambulance services, in California. 1-ER-3; *Cnty. of San Bernardino v. City of San Bernardino*, 15 Cal.4th 909, 915 (1997). At the state level, the Emergency Medical Services Authority ("EMSA") is responsible for coordinating and integrating state activities concerning emergency medical services. *E.g.* Cal. Health & Safety Code §§ 1797.1; *see also id.* at 1797.100 *et seq.* (establishing EMSA). At the local or county level, a local EMS agency ("LEMSA") plans and administers the county's local EMS programs and system. 1-ER-3; Cal. Health & Safety Code §§ 1797.200 *et seq.*; *San*

4

*Bernardino*, 15 Cal. 4th at 916. ICEMA is the LEMSA for the County. 1-ER-2–3. LEMSAs are responsible for a broad range of EMS administrative activities, including overseeing EMS personnel, facilities, and equipment. *See, e.g.*, Cal. Health & Safety Code §§ 1797.78, 1797.200 *et seq.*, 1798.100 *et seq.* LEMSAs also manage and maintain medical control over the EMS activities in their jurisdictions. *Id.* at §§ 1797.90, 1798 *et seq.*; *see also San Bernardino*, 15 Cal.4th at 925–30 (discussing medical control, as opposed to administrative control).

Key amongst a LEMSA's authorities and responsibilities are the development and submission of the local EMS plan ("EMS plan") pursuant to article 2 of chapter 4 of the EMS Act. *Id.* at §§ 1797.250 *et seq.* The EMS plan is defined as a "plan for the delivery of emergency medical services consistent with state guidelines addressing the components listed in Section 1797.103." *Id.* at § 1797.76. These statutory components are (a) manpower and training, (b) communications, (c) transportation, (d) assessment of hospitals and critical care centers, (e) system organization and management, (f) data collection and evaluation, (g) public information and education, and (h) disaster response. *Id.* at § 1797.103. The LEMSA may "implement a local plan . . . unless [EMSA] determines that the plan does not effectively meet the needs of the persons served and is not consistent with coordinating activities in the geographical area served, or that the plan is not concordant and consistent with applicable guidelines or

5

regulations . . . established by the authority." *Id.* at § 1797.105(b). The EMS system in the plan must be "based on public and private agreements and operational procedures." *Id.* at § 1797.204.

EMSA makes available counties' EMS plans once they are approved. *See Inland Counties EMS Plan Submissions*, California Emergency Medical Services Authority, https://emsa.ca.gov/ICEMA-EMSPlans/ (last visited Sept. 9, 2024). EMSA last approved ICEMA's 2022 EMS plan on March 10, 2023. Letter from Tom McGinnis, California Emergency Medical Services Authority, to Daniel Munoz, Inland Counties Emergency Medical Services Agency, regarding Approval of Inland Counties Emergency Medical Services' 2020–2022 Plan (March 10, 2023), https://emsa.ca.gov/wp-content/uploads/sites/71/2023/10/ICEMA-EMS-2020-2022.-Post-Plan.pdf. Upon approval of a plan, it is standard practice for EMSA to set the submission date for its next EMS plan. *See, e.g.*, *id.* at 1 (establishing a March 2024 deadline for ICEMA's 2023 EMS plan). ICEMA's 2023 EMS plan was submitted earlier this year and is currently under review by EMSA. EMSA has not set a deadline for ICEMA's 2024 EMS plan.

As part of its EMS plan, a LEMSA may create one or more exclusive operating areas. An exclusive operating area is defined as "an EMS area or subarea defined by the [EMS] plan for which a local EMS agency, upon the recommendation of a county, restricts operation to one or more emergency

ambulance services or providers of limited advance life support or advanced life

support." *Id.* at § 1797.85. A LEMSA may create an exclusive operating area "in

the development of a local plan, if a competitive process is utilized to select the

provider or providers of the services pursuant to the plan" or if the LEMSA

continues the use of existing, grandfathered providers. *Id.* at § 1797.224. The

process for creating an exclusive operating area is incorporated into the EMS plan

process as follows:

> A local EMS agency which elects to create one or more exclusive
> operating areas in the development of a local plan shall develop and
> submit for approval to the [EMSA], *as part of the local EMS plan*, its
> competitive process for selecting providers and determining the scope
> of their operations. ***This plan*** shall include provision for a
> competitive process held at periodic intervals.

*Id.* (emphasis added). The term "competitive process" is not defined by the EMS

Act, any other EMS statute, or any California state regulation or other guidance.

*See* 2-ER-152.

The exclusive operating area provisions of the EMS Act, *id.* at §§ 1797.85,

1797.224, were added by the legislature in 1984 along with a statement regarding

antitrust immunity. This provision reads as follows:

> (a) It is the policy of the State of California to ensure the provision of
> effective and efficient emergency medical care. The Legislature finds
> and declares that achieving this policy has been hindered by the
> confusion and concern in the 58 counties resulting from the United
> States Supreme Court's holding in *Community Communications
> Company, Inc. v. City of Boulder, Colorado*, 455 U.S. 40, 70 L. Ed.

7

2d 810, 102 S. Ct. 835 (1982) , regarding local governmental liability under federal antitrust laws.

(b) It is the intent of the Legislature in enacting this section and Sections 1797.85 and 1797.224 to prescribe and exercise the degree of state direction and supervision over emergency medical services as will provide for state action immunity under federal antitrust laws for activities undertaken by local governmental entities in carrying out their prescribed functions under this division.

*Id.* at § 1797.6.

## 2. County Policy Manual and Procurement Manual

The County's Policy Manual (which contains Board-approved procurement policies) and Procurement Manual (which sets forth additional procurement guidance) guide the County's competitive procurement activities, including the award of any exclusive County contract to provide emergency medical services in an exclusive operating area. *See generally* 2-ER-180–89, 205–50. The procedure typically used to select service providers is an RFP, 2-ER-187, 225, and the evaluation method employed is the "Best Value Evaluation." *Id.*; *see also* 2-ER-183–87, 189, 210, 224, 232–33. The Best Value Evaluation determines the proposals offering the optimal combination of quality, price, and various qualitative elements of required goods, supplies, equipment, and services. *Id.*; *see also* 2-ER-183–87, 189, 210, 224 ("The adopted practice . . . is to award to the vendor(s) whose proposal(s) [are] the most advantageous to the County"), 232–33. The Best Value Evaluation does not require an award to the highest-scoring

proposal; instead, the goal of the evaluation is to determine which proposal offers the government "the greatest or best value for its money." 2-ER-183.

An RFP employing the Best Value Evaluation methodology includes evaluation criteria which "are established prior to the release of the RFP" and include "the categories of evaluation (but not all criteria within each category)." 2-ER-224. "An evaluation panel reviews and scores proposals using the predetermined evaluation criteria." *Id.* Following scoring, the County may issue an "Invitation to Negotiate" with "a short list of proposers to obtain best value during an RFP process." 2-ER-226.

Ultimately, the Manuals require that the Board has the "*sole* authority to approve contracts" with providers on behalf of the County. 2-ER-197 (emphasis added). In fact, County employees are required to emphasize to service providers that "there is no commitment or contract until final approval has been given by the Board of Supervisors." *Id.*

### B.    ICEMA's Competitive Process, Utilizing the Best Value Evaluation Methodology

County Appellees developed a competitive process in the form of an RFP that utilized the Best Value Evaluation methodology to evaluate bids for the exclusive provision of ground ambulance transportation services, interfacility transports, and critical care transports. 4-ER-664, 686–821. Consistent with the

County's Board-approved Policy Manual and Procurement Manual, the RFP used a Best Value Evaluation methodology. *See* 2-ER-180–89, 205–50.

Before releasing the RFP, ICEMA engaged with EMSA, providing an advance copy for feedback. 1-ER-3–4; 2-ER-152; 4-ER-664. As all parties agree, EMSA approved the RFP on November 29, 2022. AMR Br. at 9; 1-ER-3–4; 2-ER-152; 4-ER-664. Thereafter, on December 20, 2022, the County released the RFP. 4-ER-686. At no point did County Appellees deviate from the County's established procurement practices for this RFP, or suggest they would deviate therefrom, nor did EMSA suggest or request such a deviation.

1.  The RFP

The RFP does not require the highest scoring-scoring proposal to win. On its face, the RFP makes clear the County's intent to award the contract to the "highest scoring [p]roposer whose proposal conforms to the RFP *and whose proposal presents the greatest value. . . .*" 4-ER-692 (emphasis added). Indeed, the RFP again and again directly evidences the County's discretion to evaluate a broad set of qualifications and select a provider that presents the overall best value to the County and its residents and visitors:

| Section of RFP | Quotation (Emphasis Added) |
|---|---|
| Section 1.3(A)<br><br>(4-ER-692) | The County intends to award an initial five (5) year<br><br>contract to the highest scoring Proposer whose proposal |

10

| | |
|---|---|
| | conforms to the RFP and whose proposal <u>presents the greatest value. . . .</u>  The County realizes that <u>criteria other than price is important</u> and <u>will award a contract based on the highest scoring proposal that demonstrates the best value and meets the needs of the County</u>. |
| Section 1.4<br><br>(4-ER-693) | Other key considerations are the sustainability of the system through quality patient care, <u>provider financial stability</u>, compliance with state and local laws and ICEMA physician medical control/direction. |
| Section 2.1<br><br>(4-ER-702) | The County intends to award a contract to the respondent whose proposal meets all of the [RFP] criteria and receives the highest score from the scoring sheet as evaluated by the Proposal Review Committee (Committee) <u>and best meets the needs of the County</u>. . . ,  This RFP does not commit the County to award a contract.  <u>The County reserves the right to reject any or all Proposals if it is in the best interest of the County to do so</u>.  The County also reserves the right to terminate this RFP process at any time. |

| Section 2.13 (4-ER-706) | The County may require the potential Proposer(s) selected to participate in negotiations . . . . |
| Section 2.13(D) (4-ER-707) | Financial information may be used to evaluate and select the proposal deemed to be in the County's best value. |

The RFP further preserves the County's discretion to award an exclusive contract to an EMS provider: neither the RFP nor any other authority requires the County to award a contract; the RFP itself states that it is an expression of *intent* to award a contract that presents the best value.  4-ER-692 ("The County intends to award an initial five (5) year contract.").

2.    The Evaluation and Contract Selection

Only two providers, AMR and CONFIRE, submitted proposals in response to the RFP.  1-ER-4.  Three of four Committee evaluators scored CONFIRE highest, but one evaluator scored AMR 35 points higher (2-ER-252–56):

| Evaluator | CONFIRE | AMR |
|:---:|:---:|:---:|
| 1 | **383** | 373 |
| 2 | 384 | **419** |
| 3 | **363** | 346 |
| 4 | **385** | 381 |
| *Total* | *1515* | *1519* |
| *Median* | *383.5* | *377* |

12

As a result of the aberrant evaluator's score (419 points), which was 52 points higher than the average score given by the other three evaluators (367 points), AMR received the highest cumulative score despite also earning the lowest individual score from an evaluator. But AMR's and CONFIRE's scores were nonetheless substantially equivalent—AMR's total score was 0.26% higher than CONFIRE's (1,519 vs. 1,515), while CONFIRE's median score was 1.72% higher than AMR's (383.5 vs. 377).

Recognizing that the scores were "substantially equivalent," the County issued a Notice of Intent to Negotiate to both AMR and CONFIRE on June 5, 2023, notifying the entities that the County would begin contract negotiations with both AMR and CONFIRE. 4-ER-830–31. Upon completing contract negotiations, the County issued a Notice of Intent to Award on October 27, 2023, 4-ER-833. Although the County acknowledged that AMR had "received the highest score," the Notice concluded that "the difference in scores is substantially equivalent," and informed AMR that "draft contracts from each proposer will be presented to the Board of Supervisors for consideration and ultimate award." *Id.*. The Notice of Intent to Award reiterated that "[n]either staff nor the evaluation panel can legally bind the Board" and that "the Board is vested with the sole discretion and ultimate authority to select and approve a contract for services which best meets the needs of the County and the public." *Id*.

Both the June 2023 Notice of Intent to Negotiate and the later, October 2023 Notice of Intent to Award were consistent with the RFP (4-ER-706 ("[t]he County may require the potential Proposer(s) selected to participate in negotiations)) and the Policy Manual and Procurement Manual (*see, e.g.*, 2-ER-226 (the County may issue an "Invitation to Negotiate" to a short list of proposers)).

Following the County's notification (in the October 27, 2023, Notice of Intent to Award) that the Board would consider both parties' draft contracts, AMR submitted a letter of protest to the San Bernardino County Purchasing Department on November 3, 2023. 4-ER-835–40. AMR argued that, because it received the highest score, the County had no authority to enter into contract negotiations with CONFIRE in addition to AMR (4-ER-838) and that the County was bound to award a contract "based on the highest scoring proposal received." *Id.* (internal alterations omitted). AMR did not raise any arguments regarding CONFIRE's bid. The County denied AMR's appeal on November 28, 2023, finding that the County acted in compliance with the RFP. 4-ER-842–44. Shortly thereafter, AMR submitted a notice of protest with the Board on November 30, 2023, on the same grounds as its appeal, again without challenging CONFIRE's bid. 4-ER-846-48.

During the Board's regular meeting on December 5, 2023, the Board considered the AMR and CONFIRE proposals. 3-ER-297–322. After initial presentations on the proposals, 3-ER-297–306, the Board heard extensive public

14

comments from the community, 3-ER-307–20.  Board Chair Rowe cited the

Board's obligation to perform a Best Value Evaluation, as contemplated in the RFP

and applicable policies.  3-ER-320.  The Board engaged in a dialogue about which

proposal offered the best value, and each Supervisor cited reasons why CONFIRE

offered the best value, including that: CONFIRE was eligible for supplemental

state funding which could support the system (3-ER-321), CONFIRE's proposal

improved public safety by closer "integration or coordination of services,"

particularly during disasters, by consolidating EMS and fire response (*id.*),

CONFIRE promised better service with faster response times (*see, generally,* 3-

ER-320–22), and CONFIRE was a preferred provider by the community, based on

input from cities, towns, and fire agencies (3-ER-321).

Accordingly, consistent with the EMS Act, RFP, the Policy Manual, and the

Procurement Manual, the Board denied AMR's protest and awarded the contract to

CONFIRE.  3-ER-322.

## II.      Procedural History

Displeased with the County's award of the contract to CONFIRE, on

February 2, 2024, AMR filed its Verified Complaint and Petition for Writ of

Mandate in United States District Court for the Central District of California (the

"Complaint").  4-ER-658–84.  The Complaint's only Federal cause of action

purports to allege a violation of section 1 of the Sherman Act, 15 U.S.C. § 1.  In

15

relevant part, the Complaint alleges that County Appellee' unlawfully awarded the exclusive contract to CONFIRE instead of to AMR (4-ER-673-77). Although CONFIRE was named as a defendant in other claims, it is not a party in the Federal antitrust cause of action and is instead named as a Real Party in Interest.[1] County Appellees and CONFIRE filed Motions to Dismiss on March 8, 2024. *See* 2-ER-139–283, 3-ER-381–415. County Appellees and CONFIRE asserted that the case must be dismissed because, in relevant part, County Appellees are immune from antitrust liability under the state-action immunity doctrine. *See generally* 2-ER-139–74.

On April 19, 2024, the district court granted County Appellees' and CONFIRE's Motions to Dismiss, dismissing all three causes of action in the Complaint without leave to amend. 1-ER-3–12. In dismissing the Federal antitrust claim, the district court considered whether the County's decision to award the exclusive contract to CONFIRE is a state action immune from antitrust liability. 1-ER-8. After determining that the EMS Act "authorizes [counties to award] exclusive ambulance contracts, which has foreseeable anticompetitive effects," the

---

[1] The other counts, which are not appealed by AMR, AMR Br. at 3, n.1, were state law claims for a peremptory writ of mandate (4-ER-677–80) and for a declaration regarding California Constitution Article XIII C, as amended by Proposition 26 (4-ER-680–82). The district court declined to exercise supplemental jurisdiction over these state-law claims and dismissed the Complaint in full, with prejudice. 1-ER-10–12.

district court concluded that the County's decision to award the contract to CONFIRE is plainly a state action entitled to immunity. 1-ER-9–10. In accordance with Ninth Circuit precedent, the district court also found that County Appellees are not excluded from state-action immunity even assuming the truth of AMR's allegation that the County deviated from its RFP to award the contract. 1-ER-9.

## III.   California Superior Court Proceedings

Following the district court's order and judgment, AMR filed suit in San Bernardino County Superior Court on June 18, 2024. *See* Compl., *American Medical Response of Inland Empire v. County of San Bernardino, et al.*, No. CIVSB2416492 (Cal. Super. Ct. San Bernardino Cnty.) (hereinafter "Superior Court Proceeding"). AMR moved for a preliminary injunction, seeking to enjoin County Appellees from proceeding with the exclusive ambulance services contract entered into between the County and CONFIRE. County Appellees' and Real Party in Interest's Joint Mot. for Judicial Notice, Ex. A, ECF No. 23. County Appellees and CONFIRE opposed AMR's motion, and a hearing was held July 9, 2024. *Id.* By an order entered on September 12, 2024, the court granted AMR's motion of a preliminary injunction and, during the pendency of the Superior Court Proceeding, enjoined County Appellees and CONFIRE "from performing, proceeding under, or implementing services pursuant to, the contract for Advanced

Life Support and Basic Life Support Ground Ambulance Services, Interfacility and

Critical Care Transport for Exclusive Operating Areas in San Bernardino County,

Contract No. 23-1282." *Id.* As of the date of this filing, the preliminary injunction

remains in place, and the challenged agreement at the center of the case at bar

continues to be inoperative.

## SUMMARY OF THE ARGUMENT

The district court was correct to dismiss this case, which is nothing more

than a state procurement challenge improperly dressed up as a federal antitrust

action. Indeed, AMR is simultaneously litigating its bid dispute in state court, *see*

AMR Br. at 3 n.1, Superior Court Proceeding, No. CIVSB2416492 (Cal. Super. Ct.

San Bernardino Cnty.), while providing no rationale for simultaneously seeking

duplicative relief in Federal court.

At base, AMR challenges the County's award of an exclusive contract to

CONFIRE for emergency medical services in specified exclusive operating areas,

not because AMR believes that exclusive contracting is contrary to the EMS Act,

but because AMR believes it was entitled to that exclusive contract. The County's

award of an exclusive contract for emergency medical services is *exactly*

contemplated and authorized by the California legislature in the EMS Act, and thus

*exactly* the sort of state action entitled to antitrust immunity. *See Redwood Empire*,

18

190 F.3d 949; *A-1 Ambulance*, 90 F.3d 333; *Mercy-Peninsula Ambulance,* 791 F.2d at 758; *e.g.*, Cal. Health & Safety Code §§ 1797.6, 1797.85, 1797.224.

AMR's protests to the contrary are unavailing. *First*, the district court rightly rejected AMR's attempt to shoehorn its (redundant) state court procurement challenge into a Federal antitrust action as unavailing and improper in the face of decades of binding precedent confirming that state-action immunity does not depend upon a municipality's proper application of state law. As the district court observed, "even accepting Plaintiff's allegations that County Defendants deviated from the competitive process approved by the EMSA as true, the failure to properly adhere to the RFP's requirements does not exclude County Defendants from state-action immunity." 1-ER-9 (citing *Boone*, 841 F.2d at 891; *Llewelyn* 765 F.2d at 774). Rather, it is well settled that state-action immunity affords local governments authority "broader than what is applied to determine the legality of the municipality's action under state law," so as to prevent state-action immunity "from undermining the very interests of federalism it is designed to protect." *Omni*, 499 U.S. at 372. AMR ignores binding Supreme Court precedent foreclosing its protestations regarding illegality and cannot distinguish the Ninth Circuit precedent that it does address.

Finally, even if allegations of illegality could theoretically narrow County Appellee's scope of authority and call state-action immunity into question (they

cannot), AMR's allegations would fail to do so here because they are premised on an erroneous understanding of the EMS Act and a selective reading of the RFP. AMR assumes that the EMS Act requires that an RFP receive advance approval by EMSA on a stand-alone basis. Not so. By statute, the RFP is only required to be developed and submitted to EMSA "as part of the local EMS plan." Cal. Health & Safety Code § 1797.224. The 2024 EMS plan (which would include the RFP) has not been submitted to or reviewed by EMSA because it is not yet due. Thus, AMR cannot argue that County Appellees have contravened the local EMS plan. Moreover, the County's selection of CONFIRE was wholly consistent with the RFP. AMR's and CONFIRE's scores were substantially equivalent, and the RFP made clear that the County would award the contract that represents the best value.

This Court should affirm the district court's holding that County Appellees are immune from antitrust liability under the state-action immunity doctrine and leave this state law procurement dispute to the state courts, where it belongs, and indeed, is already being litigated.

## STANDARD OF REVIEW

The Ninth Circuit reviews a district court's grant of a motion to dismiss, including on the pure legal grounds of state-action immunity, *de novo*. *Traweek*, 920 F.2d at 589; *Grason Elec. Co. v. Sacramento Mun. Utility Dist.*, 770 F.2d 833, 835 (9th Cir. 1985).

# **ARGUMENT**

For nearly four decades, it has been settled law that California counties are immune from antitrust liability for exclusive contracts with EMS providers under the state-action doctrine. *E.g.*, *Mercy-Peninsula Ambulance*, 791 F.2d at 758. Moreover, the Supreme Court and the Ninth Circuit have unequivocally held that the illegality of a municipality's actions do not defeat the municipality's state-action immunity. *E.g.*, *Omni*, 499 U.S. 365; *Boone*, 841 F.2d 886; *Llewellyn*, 765 F.2d 769. In such a case, an aggrieved competitor may properly use state processes to challenge the legality of the municipality's actions—which AMR has done here with its pending Superior Court Proceeding. But the Federal courts will neither determine the legality of the municipality's conduct, nor limit the scope of immunity to lawful conduct. *E.g.*, *Boone*, 841 F.2d at 892.

Despite the clear weight of authority foreclosing AMR's appeal and the duplicative nature of this appeal (AMR has already secured a preliminary injunction in the Superior Court Proceeding making the challenged exclusive contract inoperative, County Appellees' and Real Party in Interest's Joint Mot. for Judicial Notice, Ex. A, ECF No. 23), AMR nonetheless urges this Court to transform its procurement dispute into a Federal antitrust action and determine the lawfulness of County Appellees' exclusive contract. This Court should instead

21

affirm the district court's proper dismissal of AMR's Federal antitrust action,

leaving AMR's concerns to be resolved by EMSA and the California courts.

**I.** **The District Court Properly Applied State-Action Immunity Because the County's Exclusive Agreement for Emergency Medical Services is Precisely Contemplated by the EMS Act.**

As AMR (at 30) and the district court (1-ER-8) agree, substate governmental

entities, such as the County, are immune from federal antitrust liability for

anticompetitive activities carried out pursuant to a "clearly articulated and

affirmatively expressed state policy to displace competition." *FTC v. Phoebe*

*Putney Health Sys., Inc.*, 568 U.S. 216, 226 (2013). It is settled law that, in

adopting the EMS Act, "the California Legislature intended to allow EMS agencies

to create exclusive operating areas for" EMS providers. *A-1 Ambulance*, 90 F.3d

at 336 ; *see also Redwood Empire*, 190 F.3d at 953 (holding that state-action

immunity extends to "an exclusive operating area for services contemplated by the

EMS Act"); *Mercy-Peninsula Ambulance*, 791 F.2d at 758 ("There can be no

question that the statute's authorization for the counties to contract for paramedic

services, and to regulate who can provide them, has a foreseeably anti-competitive

effect which excludes some potential service providers.").

Here, County Appellees created an exclusive operating area for emergency

medical services and entered into an exclusive contract with CONFIRE, which

falls squarely within the legislature's clearly articulated and affirmatively

expressed state policy. Nonetheless, AMR—without reference to two of the three Ninth Circuit cases applying antitrust immunity to exclusive contracting for emergency medical services in California—argues that County Appellees' conduct in this case does not satisfy the requirements for state-action immunity. If AMR were permitted to litigate its bid protest in a Federal antitrust suit, it would inappropriately "embroil the federal courts in the unnecessary interpretation of state statutes," *Hallie*, 471 U.S. at 44 n.7. "Besides burdening the courts, it would undercut the fundamental policy of *Parker v. Brown*, 317 U.S. 341 (1943)] and the state action doctrine of immunizing state action from federal antitrust scrutiny." *Id.* Rather, this Court should readily affirm the district court's dismissal of AMR's suit.

As a general matter, there are three approaches to assessing the application of state-action immunity (often called *Parker* immunity after its namesake case) depending on the identity of the actor. First, if the actor is the state itself (*e.g.*, the state legislature or state supreme court), by definition, state-action immunity applies. *Hoover v. Ronwin*, 466 U.S. 558, 567–68 (1984). Second, if the actor is a municipality or an executive state agency (other than one controlled by market participants), the clear-articulation test governs application of state-action immunity. *Hallie*, 471 U.S. at 45. Finally, if the actor is a private party or a state agency controlled by active market participants, both the clear-articulation and the

23

active-supervision tests must be satisfied to trigger state-action immunity. *N.C. State Bd. of Dental Exam'rs v. F.T.C.*, 574 U.S. 494, 511–12 (2015). This case involves the second scenario—AMR challenges County Appellees' conduct, and state-action immunity will apply if the clear-articulation test is met.

The Ninth Circuit has "adopted a two-part test to determine whether a 'clearly articulated' state policy has authorized a municipality's anticompetitive actions." *Traweek*, 920 F.2d at 591 (quoting *Boone*, 841 F.2d at 890). Under this test, a court first determines "whether the legislature authorized the challenged actions," and then proceeds to determine "whether the legislature intended to displace competition with regulation." *Id.* at 591–92. This clear-articulation test must be approached "practically, but without diluting the ultimate requirement that the State must have affirmatively contemplated the displacement of competition such that the challenged anticompetitive effects can be attributed to the state itself." *Phoebe Putney*, 568 U.S. at 229 (internal quotations omitted); *see also Omni*, 499 U.S. at 373 ("It is enough . . . if suppression of competition is the 'foreseeable result' of what the statute authorizes."); *Hallie*, 471 U.S. at 42 ("[I]t is sufficient that the statutes authorized the City to provide sewage services and also to determine the areas to be served. We think it is clear that anticompetitive effects logically would result from this broad authority to regulate.").

24

As the district court correctly held, 1-ER-9, the California legislature contemplated and authorized the challenged conduct: the creation of exclusive operating areas and the use of exclusive contracts for emergency medical services in those areas. In fact, AMR does not dispute that County Appellees may establish an exclusive operating area and exclusively contract for emergency medical services within that area. AMR's prayer for relief seeks an injunction requiring County Appellees to follow the RFP (1-ER-682), which AMR believes would require the County to award the exclusive contract to AMR (AMR Br. at 13). Because AMR seeks exclusive contracting to its own advantage, it concedes that exclusive contracting is authorized by the EMS Act.

Moreover, AMR has repeatedly conceded that the California legislature in the EMS Act specifically authorized County Appellees to displace competition in the provision of ambulance services. *See* AMR Br. at 46 ("[W]hile section 1797.224 ultimately contemplates the grant of an exclusive contract (an anticompetitive outcome) . . ."); 4-ER-664 ¶ 30 ("California's clearly articulated and affirmatively expressed policy ***authorizing local governments to confer exclusivity*** in the provision of ambulance services is set forth in the EMS Act.") (emphasis added); *see also* 1-ER-9 ("Plaintiff does not contest California has a clearly articulated policy that authorizes awarding exclusive ambulance contracts, which has foreseeable anticompetitive effects.").

25

AMR is right to concede as much: as the district court held (1-ER-9), the California legislature *explicitly* authorizes the creation of exclusive operating areas and the awarding of exclusive ambulance contracts. In March 1984, the California legislature expressed concern regarding the "confusion and concern . . . regarding local government liability under federal antitrust laws" following the Supreme Court decision in *Boulder*, 455 U.S. 40. Cal. Health & Safety Code § 1797.6. To address these concerns, the legislature amended the EMS Act to add sections 1797.6, 1797.85, and 1797.224, confirming local EMS agencies' authority exclusively contract in exclusive operating areas. *Id.*; *see also Mercy-Peninsula Ambulance*, 791 F.2d at 757 n.1, 758 & n.2 (describing March 1984 legislative changes). In doing so, the legislature expressly authorized the local EMS agency to "restrict[] operations to one or more emergency ambulance services or providers of limited advance life support or advanced life support." Cal. Health & Safety Code § 1797.85; *see also id. at* § 1797.224. The amended EMS Act also memorialized "the intent of the Legislature in enacting this section and Sections 1797.85 and 1797.224 to prescribe and exercise the degree of state direction and supervision over emergency medical services as will provide for state action

immunity under federal antitrust laws" for local governmental entities.  *Id.* at § 1797.6(b).[2]

Moreover, it necessarily follows that the legislature intended to displace competition with regulation for emergency medical services.  By expressly directing LEMSAs to develop EMS plans, *id.* at § 1797.250 *et seq.*, requiring them to base their EMS systems under these plans "on public and private agreements," *id.* at § 1797.204, and authorizing them to establish exclusive operating areas, *id.* at §§ 1797.85, 1797.224, the legislature made clear its intent to displace competition for emergency medical services in favor of regulation.

As this Court has previously held, the EMS Act makes clear the state's intent to displace competition and provides a sufficient degree of state authorization for County Appellees to act anticompetitively in establishing exclusive operating areas and contracting with EMS providers:

> [T]he statute on its face is a broad, discretionary grant of authority to the counties to regulate and contract for services.  Virtually any anti-competitive effect, including exclusive contracts with primary providers and elimination of backup ambulance services altogether, would appear to be well within the statute's contemplation.  Conduct that excludes Mercy and other ambulance companies from competing

---

[2] The following year, the Supreme Court held that the active state supervision requirement for *Parker* immunity does not apply to municipalities.  *Hallie*, 471 U.S. at 46–47.  As such, the "degree of state direction supervision over emergency medical services as will provide for state action immunity" for California municipalities, Cal. Health & Safety Code § 1797.6(b), is simply zero.

with designated primary providers is an anti-competitive effect which
logically would result from this broad authority to regulation.

*Mercy-Peninsula Ambulance*, 791 F.2d at 758; *Redwood Empire*, 190 F.3d at 954

(holding state-action immunity applies to exclusive contract for ambulance

services); *A-1 Ambulance*, 90 F.3d 336–37 ("[T]he California Legislature intended

to permit EMS agencies to create exclusive operating areas for . . . emergency

ambulance services").  There is thus no question that the EMS Act "confers

express authority" on California counties to act in ways that foreseeably will result

in anticompetitive effects; indeed, the legislature expressly intends for California

counties to be able to enter into exclusive contracts with EMS providers.

Largely ignoring this dispositive precedent, AMR (at 30–31, 47–48) quotes

from cases where the state had not clearly articulated and affirmatively expressed a

policy to displace competition.  *E.g.*, *Comty. Commc'ns. Co. v. City of Boulder*,

455 U.S. 40, 54–56 (1982) (holding that a state's general grant of power to enact

ordinances does not clearly articulate and affirmatively express any state policy

concerning specific anticompetitive ordinances, including an ordinance restricting

expansion by a cable television provider); *Chamber of Com. v. City of Seattle*, 890

F.3d 769, 782–85 (9th Cir. 2018) (finding no state policy authorizing private

parties to price-fix the fees for-hire drivers pay to driver coordinators like Uber and

Lyft for ride-referral services where the state laws only addressed the regulation of

for-hire transportation and vehicles and did not address payment arrangements

between for-hire drivers and such driver coordinators); *Cost Mgmt. Servs. Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 942 (9th Cir. 1996) (holding that state-action immunity did not apply to off-tariff pricing where the state policy was limited to approved tariffs); *Lancaster Comty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 402–03 (9th Cir. 1991) (holding that a hospital district is not insulated from claims of monopolization when the state law "merely authorized them to provide hospital services along with regular competitors" and there were "abundant indicators that [the] state's policy is to support competition" in health care); *Parks v. Watson*, 716 F.2d 656, 663-64 (9th Cir. 1983) (holding that anticompetitive acts undertaken "prior to the formation of a geothermal heating district" could not be insulated by state law authorizing such formation because it is "untenable that the legislature contemplated restraints on private enterprise until there was adequate assurance" of such public control). In each of these cases, the legislature had not authorized or contemplated the anticompetitive conduct challenged. In contrast, all parties agree that the EMS Act authorizes exclusive contracting with EMS providers.

Along these lines, AMR (at 47–48) references *Ellis v. Salt River Project Agricultural Improvement & Power District*, 24 F.4th 1242 (9th Cir. 2022), erroneously suggesting that the EMS Act, like the Arizona statutes at issue there, shows a preference for promoting competition. In *Ellis*, the plaintiffs alleged that

29

the political subdivision controlling the electrical grid (the "Salt River Project"), adopted a significant rate increase for new solar customers to deter the competitive threat of solar energy systems and fortify Salt River Project's monopoly power. *Id.* at 1274. The relevant statute permitted Salt River Project to adopt "just and reasonable rates," but declared that "the most effective manner of establishing just and reasonable rates is to permit electric generation service prices to be established in a competitive market." *Id.* at 1276. In light of this provision and others, Salt River Project conceded that the relevant "statutory framework expresses a general policy favoring competition." *Id.* at 1277. That general policy foreclosed Salt River Project's argument that the rate-setting provision clearly articulated and affirmatively expressed a state policy to displace competition. *Id.* In contrast, the EMS Act expressly and unambiguously expresses a state policy to displace competition through the creation of exclusive operating areas and the use of exclusive contracts. *Mercy-Peninsula Ambulance*, 791 F.2d at 758.[3]

---

[3] The Tenth Circuit's decision in *Kay Electric Co-Op v. City of Newkirk*, 647 F.3d 1039 (10th Cir. 2011), likewise does not call *Mercy-Peninsula Ambulance* and its progeny into question. In *Kay Electric*, a city confronted with allegations of unlawful tying and attempted monopolization of electricity services in annexed areas cited general enabling statutes, but these could not overcome other, more specific state laws setting forth a state policy protecting existing electric companies from municipal interference and promoting expanded competition in electricity markets. *Id.* at 1044-1046. The EMS Act, on the other hand, is neither vague nor general—rather, it expressly contemplates exclusive contracting with EMS providers. Cal. Health & Safety Code §§ 1797.85, 1797.204, 1797.224.

In short, this case presents a textbook example of state-action immunity: the California legislature explicitly granted County Appellees the authority to contract with singular providers to service exclusive EMS operating areas, Cal. Health & Safety Code § 1797.224, and let there be any doubt, further declared their intention that such an act would be immune from any antitrust liability pursuant to the state-action immunity doctrine, Cal. Health & Safety Code § 1797.6. This is the beginning and end of this case.

## II. AMR's Arguments to the Contrary are Unavailing.

AMR does not contest that the California legislature authorized counties to create exclusive operating areas or select a singular EMS provider for those areas. *See* AMR Br. at 7–8; 46; 4-ER-664 ¶ 30. On appeal, AMR's argument is that, while the state-action immunity doctrine would typically immunize County Appellees in this circumstance, they are not entitled to such immunity here, as they allegedly either acted in violation of or beyond the scope of the EMS Act provision, Cal. Health & Safety Code § 1797.224, that confers on counties the authority (and immunity) to form exclusive operating areas and enter into exclusive contracts. In decades past, aggrieved competitors, like AMR, have attempted to overcome state-action immunity and elevate their allegations of illegality under state law into Federal antitrust claims. The Supreme Court, however, has firmly closed the door on these efforts, and the district court rightly

31

dismissed AMR's suit below. Moreover, even if AMR's theory hobbling state-action immunity with allegations of illegality was tenable, these allegations are premised on a misreading of state law requirements that simply do not pass muster.

**A.** **AMR's Attempt to Escape State-Action Immunity by Asserting a Procurement Violation is Unavailing.**

Procurement disputes are as old as procurement law and are properly left to the state courts. The Federal courts have long declined to permit aggrieved competitors from using Federal antitrust law to remedy claims that a state agency or municipality contravened state law, holding that state-action immunity is not forfeited by a violation of state law. *E.g.*, *Boone*, 841 F.2d at 891–92. And in 1991, the Supreme Court decisively resolved this question in *Omni*, holding that the scope of a municipality's *authority* under state law is broader than the range of legal conduct and that the *legality* of the municipality's action under state law is not relevant for purposes of state-action immunity. 499 U.S. at 372; *see also Traweek* 920 F.2d at 593 (holding that the "legality" of a city's act "is irrelevant" for and does not defeat state-action immunity, even amidst allegations of malice); *Boone*, 841 F.2d at 892 (holding that challengers cannot "use federal antitrust law to remedy their claim that the city and agency exceeded their authority under state law"); *Llewelyn*, 765 F.2d at 774 ("The [challenged conduct] is immune from the antitrust laws . . . even though accomplished in violation of applicable rulemaking procedures."); 1-ER-9 ("[T]he failure to properly adhere to the RFP's requirements

does not exclude County Defendants from state-action immunity."). AMR does not endeavor to distinguish *Omni*; in fact, AMR's opening brief fails to disclose this controlling authority at all.

The *Omni* Court directly rejected the argument that "a municipality acts beyond its delegated authority, for [state-action immunity] purposes, whenever the nature of its regulation is substantively or even procedurally defective." 499 U.S. at 371. The Court reasoned that, were a court to require a municipality's proper application of the state law to deem the state law as "authorizing" the action, the court would "become[] the standard reviewer not only of federal agency activity but also of state and local activity whenever it is alleged that the governmental body, though possessing the power to engage in the challenged conduct, has actually exercised its power in a manner not authorized by state law." *Id.* at 371–72 (citations omitted). "[T]o prevent *Parker* from undermining the very interests of federalism it is designed to protect, it is necessary to adopt a concept of authority broader than what is applied to determine the legality of the municipality's action under state law." *Id.* at 372. AMR, however, urges this Court instead to *contract* the concept of authority for purposes of *Parker* immunity so that AMR's assertion of illegality would strip County Appellees of immunity.

AMR's position simply cannot be reconciled with the reasoning or holding of *Omni*, and the district court properly dismissed AMR's suit.[4]

Even before *Omni*, the Ninth Circuit had already rejected aggrieved competitors' attempts to evade state-action immunity with allegations of errors, illegality, or even malice on the part of municipalities and others. For example, the *Llewellyn* Court concluded that state-action immunity applied despite allegations of both procedural irregularities and "bad faith" motivations. 765 F.2d at 773–74. This was true even when the challenged action (a *de facto* fee schedule) was adopted by the state agency "in violation of applicable rulemaking procedures" and had been "invalidat[ed]" in a state administrative hearing. *Id.* at 774.

Likewise, in *Boone*, when developers argued that the relevant area was not a "blighted area" such that the municipality's redevelopment plan fell outside the cited statutory authority, this Court held that state-action immunity nonetheless applied. 841 F.2d at 891–92. "In this situation, the concerns over federalism and state sovereignty raised in *Hallie* and *Llewellyn* dictate that the developers not be allowed to use federal antitrust law to remedy their claim that the city and the

---

[4] Notably, the court went on to hold that allegations of conspiracy or corruption will also not destroy state-action immunity. *Id.* at 374–79. AMR's allegations that County Appellees failed to comply with an RFP simply cannot deprive County Appellees of state-action immunity when binding precedent confirms that even allegations of corruption would not do so.

34

agency exceeded their authority under state law." *Id.* at 892; *see also Traweek*, 920 F.2d at 593 ("The Court's rejection of substantive review of state statutes is wholly consistent with the policies of federalism and state sovereignty upon which the state action doctrine is based."). Again, allegations of "bad faith" or a "larger conspiracy" could not overcome state-action immunity and justify the Federal courts' intrusion upon internal state affairs. *Id.* at 892.

In sum, "on the question [of] whether the misuse of a clearly granted regulatory power causes state-action immunity to lapse," the "answer is a resounding 'no.'" *Lancaster Comty. Hosp.*, 940 F.2d at 403 & n.10 (citing *Traweek*, 920 F.2d at 592–93; *Boone*, 841 F.2d at 890; *Llewellyn*, 765 F.2d 769). The district court thus properly relied on *Llewellyn* and *Boone* to conclude that County Appellees are entitled to state-action immunity even if they deviated from the approved competitive process or intentionally circumvented the EMS Act. 1-ER-9–10.

AMR (at 41) attempts to evade *Llewellyn*'s clear holding by contending that "it involved a *state* agency implementing state law, not *local government* entities." This is a distinction without a difference—the clear-articulation test governs application of state-action immunity for both municipalities and state agencies (other than those controlled by market participants) in the same manner. *E.g.*, *Boone*, 841 F.2d at 891 (noting that "*Llewellyn* involved the action of a state

35

agency, not a municipality" and applying its holding in a case involving a municipality); *see also Hoover*, 466 U.S. at 568–69 (discussing applicability of state-action immunity to the acts of both state agencies and municipalities).

AMR (at 41–42) then goes on to contend that the challenged conduct in *Llewellyn* was actually an action of the state itself (rather than a state agency). Not so. The *Llewellyn* Court explains that the "individual defendants [were acting] in their administrative capacity" and exercising "delegated authority." 765 F.2d at 773. Unlike state legislation which is "*ipso facto* . . . exempt from the operation of the antitrust laws" as an act of the State, the actions of a state agency must fit within the bounds of a clearly articulated and affirmatively expressed state policy to replace competition with regulation. *Hoover*, 466 U.S. at 567–69. The *Llewellyn* Court (like the district court here), thus properly looked to state law for that authorization, but did not entertain allegations of illegality. 765 F.2d at 774. AMR provides no other argument against *Llewellyn*'s application in the case at bar. Thus, because AMR's sole protests against *Llewellyn*'s applicability rely on a mistake and an immaterial difference, AMR has provided no coherent basis for reversing the district court's dismissal in reliance on *Llewellyn*.

AMR goes on to argue that *Boone* is distinguishable from the case at bar because County Appellees "unilaterally award[ed] a contract . . . in complete disregard of the State-mandated process," while the municipality's actions in

36

*Boone* "were *specifically authorized* by the state legislature" and were thus "immunized even though the actual execution of this power may have been imperfect." AMR Br. at 44. In fact, the *Boone* plaintiffs argued that the necessary prerequisite for the challenged modification to the redevelopment plan—blight in downtown San Jose—was not present such that "the city and the agency exceeded their authority under state law." 841 F.2d at 891–92. This is indistinguishable from AMR's attempt to elevate its claims of non-compliance with state law into antitrust liability. And, in fact, AMR—like the developers in *Boone*, 841 F.2d at 891–92—have filed suit in state court seeking review of County Appellees' actions. *See* County Appellees' and Real Party in Interest's Joint Mot. for Judicial Notice, Ex. A, ECF No. 23. AMR fails to provide any justification for pursuing a Federal antitrust suit in parallel with its suit in state court and does not discuss the concerns over federalism and state sovereignty that "dictate that [they] not be allowed to use federal antitrust law to remedy their claim that [municipal actors] exceeded their authority under state law," *Boone*, 841 F.2d at 892.

In short, *Omni*, *Llewellyn*, and *Boone* confirm that the door is firmly closed to AMR's attempt to overcome state-action immunity with allegations of illegality or impropriety. California's legislature clearly authorized County Appellees to enter into exclusive contracts with EMS providers. None of County Appellees' actions remove them from this statutory scheme, nor did County Appellees err in

their implementation of the RFP (*see* Part II.B, *infra*). But even if they had, AMR's proper remedy would be through a procurement lawsuit in California court—not federal antitrust law. *See, e.g.*, *Boone*, 841 F.2d at 891–92 (noting that "[d]ecisions made by municipalities acting under the redevelopment act are reviewable in state courts" and concluding that "the concerns over federalism and state sovereignty raised in *Hallie* and *Llewellyn* dictate that the developers not be allowed to use federal antitrust law to remedy their claim that the city and the agency exceeded their authority under state law."); *Kern-Tulare Water Dist. v. City of Bakersfield*, 828 F.2d 514, 522 (9th Cir. 1987) ("Where ordinary errors or abuses in exercise of state law, . . . serves to strip the city of state authorizations, aggrieved parties should not forego customary state corrective processes in favor of federal antitrust remedies.") (internal citation omitted); *Llewellyn*, 765 F.2d at 774 ("Here state corrective processes were available, and the aggrieved parties could resort to them."). As such, the district court's dismissal of AMR's claims should be affirmed.

### B. AMR Cannot Allege that County Appellees Acted Outside the Bounds of the EMS Act.

Even if AMR's allegations that the County's exclusive contract for EMS services was unlawful could erode the scope of authorization under the EMS Act for purposes of state-action immunity, the contention would nonetheless fail because County Appellees complied with the EMS Act.

38

At the outset, it bears articulating precisely what AMR is contesting.  Again, all parties agree that the EMS Act authorizes exclusive contracting with EMS providers.  AMR Br. at 7–8.  All parties agree that here, ICEMA engaged with California's EMSA before issuing the RFP, and EMSA approved the proposed RFP on November 29, 2022.  AMR Br. at 9.  AMR has made clear that it "takes no issue with the legality of the RFP."  2-ER-121.  AMR's argument now is that County Appellees nonetheless acted "unilaterally" and outside the bounds of the EMS Act's state approved process, and thus outside the bounds of immunity, because County Appellees (1) voluntarily provided the RFP to EMSA for advance review[5] and (2) considered and selected CONFIRE's proposal (which, AMR argues, was improper because AMR was the highest-scoring bidder).  AMR Br. at 33–40.  Both theories are meritless.

---

[5] This argument is new on appeal.  In its own briefing below, AMR maintained that it "takes no issue with the legality of the RFP."  2-ER-121.  Thus, the district court correctly summarized that AMR was challenged "County Defendants' *application* of the RFP and not the *legality* of the RFP – i.e. whether County Defendants' award of an exclusive Contract goes beyond what was contemplate by the EMS Act."  1-ER-9–10.  AMR (at 45–46) now disputes the district court's articulation of AMR's position, but does so without support.  In fact, AMR's position on appeal that the RFP itself was illegal because it was voluntarily submitted, AMR Br. at 36–37, 44, is wholly new and thus waived.  *See S.E.C. v. Internet Solutions for Business Inc.*, 509 F.3d 1161, 1167 (9th Cir. 2007) (This Court "will not consider arguments raised for the first time on appeal[]" and will treat such arguments as "waived.").

1.   <u>AMR's Argument Erroneously Conflates the Voluntary</u>
<u>Submission of an RFP with the Submission and Approval of the</u>
<u>EMS Plan Itself.</u>

AMR attempts to elevate its procurement dispute into an antitrust action by

arguing that County Appellees' actions constitute a "repudiation of the State-

mandated process" under section 1797.224 of California's Health and Safety Code.

AMR Br. 34.  But in doing so, AMR repeatedly misstates the requirements of

section 1797.224, equating the required submission of a "local EMS plan" under

section 1797.224 with the voluntary submission of the proposed RFP as part of

County Appellees' general advance engagement with EMSA.  *See* AMR Br. at 46

("In authorizing local agencies to choose an exclusive ambulance provider, the

EMS Act requires a LEMSA to follow a State-approved *competitive* process. . . .

Yet, the County ultimately allowed its own procurement policies and political

preferences to supplant the requirements of the State-approved competitive process

. . . ."); *id.* at 33, 37–38, 44 (repeatedly referring to a "State Authority-approved

competitive process," "State Authority-approved RFP," "State-approved

competitive process").  AMR also erroneously complains that County Appellees'

characterization of the RFP submission as a voluntary process suggests that County

Appellees were acting outside of the process under section 1797.224.  *Id.* at 36–37,

44.

Contrary to AMR's assertions, no advance approval of the competitive process under section 1797.224 is required; rather, the County is charged with "develop[ing] and submit[ting] for approval to the authority, *as part of the local EMS plan*, its competitive process for selecting providers and determining the scope of their operations."  Cal. Health & Safety Code § 1797.224 (emphasis added).  The EMS plan is defined as a "plan for the delivery of emergency medical services consistent with state guidelines addressing the components listed in Section 1797.103."[6]  *Id.* at § 1797.76.  The EMS plan is developed and submitted pursuant to article 2 of chapter 4 of the EMS Act, *id.* at §§ 1797.250 *et seq.*  The LEMSA (here, ICEMA) may "implement a local plan . . . unless the authority determines that the plan does not effectively meet the needs of the persons served and is not consistent with coordinating activities in the geographical area served, or that the plan is not concordant and consistent with applicable guidelines or regulations . . . established by the authority."  *Id.* at § 1797.105(b).

Earlier this year, the 2023 EMS plan was submitted per EMSA's instruction,[7] and is under review by EMSA.  The time for submitting the 2024

---

[6] Those components cover items ranging from manpower and training, data collection and evaluation, and disaster response and do not include further specifications for the submission of the competitive process as part of the EMS plan.  *Id.* at § 1797.103.

[7] In its letter approving the 2020 through 2022 EMS plan, EMSA set a March 2024 deadline for the 2023 EMS plan.  Letter from Tom McGinnis, California

EMS plan has not yet been set by EMSA and certainly has not passed. In short, the statutory process for reviewing the competitive process used by County Appellees has not yet begun, and any claim that County Appellees have violated the scope of state approval is premature. It is thus inappropriate for AMR to urge this Court to prejudge the outcome of EMSA's review of County Appellees' 2024 EMS plan or conclude that County Appellees have failed to adhere to an EMSA-approved EMS plan.

Moreover, AMR's elevation of the RFP to the "State-approved" plan or "State-approved" competitive process draws a false equivalence between the RFP and the EMS plan. AMR has not and cannot identify any provision of the EMS Act that requires submission and approval of the RFP before the EMS plan because the EMS Act simply does not mandate or establish a process for State review of an RFP in advance of and separate and apart from review of the EMS plan. Although AMR may not agree with the California's legislative choice in only requiring

---

Emergency Medical Services Authority, to Daniel Munoz, Inland Counties Emergency Medical Services Agency, regarding Approval of Inland Counties Emergency Medical Services' 2020–2022 Plan (March 10, 2023), https://emsa.ca.gov/wp-content/uploads/sites/71/2023/10/ICEMA-EMS-2020-2022.-Post-Plan.pdf.

submission of the RFP with the EMS plan itself, AMR cannot use an antitrust suit to change the process.[8]

### 2. County Appellees Did Not Violate or Act Outside the Bounds of the RFP.

In any event, the County adhered to the RFP and the Board-approved Policy Manual and Procurement Manual, including properly exercising the discretion afforded to the County under the applicable state and local laws. AMR takes primary issue with the fact that the Board considered both AMR's proposal and CONFIRE's proposal. AMR argues that because the RFP "unambiguously required that the exclusive contract could only go to the highest-scoring bidder that met the minimum qualifications," the Board's consideration of CONFIRE's proposal somehow shows County Appellees acted unilaterally and disregarded the EMSA-approved RFP. AMR Br. at 35. This is flawed for two reasons.

*First*, AMR's selective reading of the RFP ignores the fact that the RFP established the County's intent to award the contract to the "highest scoring

---

[8] To the extent that AMR suggests (at 32, 39) that there is an "active supervision" requirement that would mandate approval of the RFP in advance of the EMS plan, this argument is foreclosed by Supreme Court precedent. In *Hallie*, the Supreme Court held that "the active state supervision requirement should not be imposed in cases in which the actor is a municipality." 471 U.S. at 46. More recently, the Court distinguished between municipalities that operate "more like prototypical state agencies" and "specialized boards dominated by active market participants." *N.C. State Bd. of Dental Exam'rs.*, 574 U.S. at 511. Although "the need for supervision is manifest" with respect to the latter, such supervision is *not* a prerequisite for *Parker* immunity with respect to the former. *Id.*

[p]roposer whose proposal conforms to the RFP *and whose proposal presents the greatest value*. . . ." 4-ER-692, Sec. 1.3(A) (emphasis added). The RFP does not require the highest scoring-scoring proposal to win. Instead, again and again, the RFP directly evidences the County's intent to award the contract to the proposal that presents the highest value. *See, e.g.*, 4-ER-692, Sec. 1.3(A) ("The County realizes that criteria other than price is important and will award a contract based on the highest scoring proposal *that demonstrates the best value and meets the needs of the County*.") (emphasis added); 4-ER-702, Sec. 2.1 ("The County intends to award a contract to the respondent whose proposal meets all of the [RFP] criteria and receives the highest score from the scoring sheet as evaluated by the Proposal Review Committee (Committee) *and best meets the needs of the County*. . . . This RFP does not commit the County to award a contract. *The County reserves the right to reject any or all Proposals if it is in the best interest of the County to do so*. The County also reserves the right to terminate this RFP process at any time.") (emphasis added); 4-ER-707, Sec. 2.13(D) ("Financial information may be used to evaluate and *select the proposal deemed to be in the County's best value*.") (emphasis added); *see also* 4-ER-779 (directing the Committee to take into account several considerations when scoring proposals, such as the quality of the service to be provided, the level of service to be provided, the rates charged to the public, documented evidence of availability to

44

work effectively with local agencies, evidence of expertise, financial stability, and personnel issues.).[9]

**Further**, AMR's interpretation that it was necessarily entitled to be the sole entity to enter into contract negotiations with the County disregards numerous provisions of the RFP that reserve for the County the ultimate discretion to negotiate with multiple proposers and to ultimately select its provider for the exclusive operating area. *See* 4-ER-702, Sec. 2.1 ("This RFP does not commit the County to award a contract. **The County reserves the right to reject any or all Proposals if it is in the best interest of the County to do so**. The County also reserves the right to terminate this RFP process at any time.") (emphasis added); 4-ER-706, Sec. 2.13 (referencing "the potential **Proposers** selected to participate in negotiations . . . .") (emphasis added). At bottom, the selection of this service contract was a "classic discretionary function" for the Board. *Michael Leslie Prods., Inc. v. City of Los Angeles,* 207 Cal. App. 4th 1011, 1026 (2012); *Mike*

---

[9] Given the breadth of considerations involved in this procurement process, this is not a case where a simple lowest-responsible bid process is sufficient, and the RFP instead used a best evaluation process. For that reason, cases concerning competitive bidding requirements where price is the sole consideration among qualified bidders, *see, e.g.*, *Eel River Disposal & Res. Recovery, Inc. v. Cnty. of Humboldt,* 221 Cal. App. 4th 209 (2013), are simply neither useful nor determinative. Furthermore, the concept of price is different from the concept of scoring, and, in any event, the evaluation of an exclusive EMS provider can hardly be compared to the evaluation of a contract for public works.

*Moore's 24-Hour Towing v. City of San Diego,* 45 Cal. App. 4th 1294, 1303 (1996) ("[A]ll of the acts leading up to the award" of a public contract "are legislative in character") (internal citations omitted).

Here, the County did not violate the RFP or act outside its boundaries when it chose to negotiate with both AMR and CONFIRE, after the County determined that each proposal met the RFP's minimum qualifications, 2-ER-264, and the two Proposers received "substantially equivalent" scores.  2-ER-255–56.  And the County did not violate the RFP or act outside its boundaries when it ultimately decided, in its discretion, that CONFIRE's proposal "present[ed] the greatest value" to the County.  4-ER-692.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's judgment dismissing this case in full, without leave to amend.

Respectfully submitted,


DATED:  September 30, 2024          HOOPER, LUNDY & BOOKMAN, P.C.


By:      */s/ Katrina A. Pagonis*
          KATRINA A. PAGONIS
Attorneys for Defendants-Appellees

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Ninth Circuit Rule 28-2.6, Defendants-Appellees are not aware of any related cases pending before this Court.


DATED:  September 30, 2024        HOOPER, LUNDY & BOOKMAN, P.C.


By:      */s/ Katrina A. Pagonis*
                KATRINA A. PAGONIS
          Attorneys for Defendants-Appellees

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the length limits permitted by Federal Rule of

Appellate Procedure 32(a)(7)(B) and Ninth Circuit Rule 32-1.  The brief is 10587

words, excluding the portions exempted by Fed. R. App. P. 32(f). Pursuant to

Federal Rule of Appellate Procedure 32(a)(5), the brief is in 14-point,

proportionally-spaced serif font.


DATED:  September 30, 2024        HOOPER, LUNDY & BOOKMAN, P.C.


                                  By:      */s/ Katrina A. Pagonis*
                                  _____
                                          KATRINA A. PAGONIS
                                  Attorneys for Defendants-Appellees

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

DATED:  September 30, 2024          HOOPER, LUNDY & BOOKMAN, P.C.


By:      */s/ Katrina A. Pagonis*
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
              KATRINA A. PAGONIS
Attorneys for Defendants-Appellees

## TABLE OF CONTENTS – STATUTORY ADDENDUM

**Addendum Page(s)**

Chapter 1.  General Provisions .............................................................1

    § 1797 ...............................................................................................1

    § 1797.6 ...........................................................................................1

Chapter 2.  Definitions ..........................................................................2

    § 1797.54 .........................................................................................2

    § 1797.72 .........................................................................................2

    § 1797.74 .........................................................................................2

    § 1797.76 .........................................................................................2

    § 1797.78 .........................................................................................2

    § 1797.85 .........................................................................................2

    § 1797.94 .........................................................................................3

Chapter 3.  State Administration ...........................................................3

Article 1.  The Emergency Medical Services Authority.........................3

    § 1797.100 .......................................................................................3

    § 1797.103 .......................................................................................3

    § 1797.105 .......................................................................................4

Chapter 4.  Local Administration...........................................................4

Article 1.  Local EMS Agency...............................................................4

    § 1797.200 .......................................................................................4

    § 1797.204 .......................................................................................5

    § 1797.224 .......................................................................................5

Article 2.  Local Emergency Medical Services Planning .......................5

    § 1797.250 .......................................................................................5

    § 1797.252 .......................................................................................5

    § 1797.254 .......................................................................................6

    § 1797.256 .......................................................................................6

## **<u>TABLE OF CONTENTS</u>**

**<u>Addendum Page(s)</u>**

§ 1797.257 ..................................................................................6

§ 1797.258 ..................................................................................6

§ 1797.259 ..................................................................................6

## STATUTORY ADDENDUM

**California Health & Safety Code, Sections 1797** *et seq.*
**Emergency Medical Services System and the Prehospital Emergency Medical Care Personnel Act**
**Excerpts**

## CHAPTER 1.  GENERAL PROVISIONS

§ 1797

This division shall be known and may be cited as the Emergency Medical Services System and the Prehospital Emergency Medical Care Personnel Act.

\* \* \*

§ 1797.6

(a)  It is the policy of the State of California to ensure the provision of effective and efficient emergency medical care. The Legislature finds and declares that achieving this policy has been hindered by the confusion and concern in the 58 counties resulting from the United States Supreme Court's holding in Community Communications Company, Inc. v. City of Boulder, Colorado, 455 U.S. 40, 70 L. Ed. 2d 810, 102 S. Ct. 835, regarding local governmental liability under federal antitrust laws.

(b)  It is the intent of the Legislature in enacting this section and Sections 1797.85 and 1797.224 to prescribe and exercise the degree of state direction and supervision over emergency medical services as will provide for state action immunity under federal antitrust laws for activities undertaken by local governmental entities in carrying out their prescribed functions under this division.

\* \* \*

## **Chapter 2.  Definitions**

\* \* \*

§ 1797.54

"Authority" means the Emergency Medical Services Authority established by this division.

\* \* \*

§ 1797.72

"Emergency medical services" means the services utilized in responding to a medical emergency.

§ 1797.74

"Emergency medical services area" or "EMS area" means the geographical area within the jurisdiction of the designated local EMS agency.

§ 1797.76

"Emergency medical services plan" means a plan for the delivery of emergency medical services consistent with state guidelines addressing the components listed in Section 1797.103.

§ 1797.78

"Emergency medical services system" or "system" means a specially organized arrangement which provides for the personnel, facilities, and equipment for the effective and coordinated delivery in an EMS area of medical care services under emergency conditions.

\* \* \*

§ 1797.85

"Exclusive operating area" means an EMS area or subarea defined by the emergency medical services plan for which a local EMS agency, upon the recommendation of a county, restricts operations to one or more emergency ambulance services or providers of limited advanced life support or advanced life support.

* * *

§ 1797.94

"Local EMS agency" means the agency, department, or office having primary responsibility for administration of emergency medical services in a county and which is designated pursuant to Chapter 4 (commencing with Section 1797.200).

* * *

## Chapter 3.  State Administration

### *Article 1.  The Emergency Medical Services Authority*

§ 1797.100

There is in the state government, in the California Health and Human Services Agency, the Emergency Medical Services Authority.

* * *

§ 1797.103

The authority shall develop planning and implementation guidelines for emergency medical services systems which address the following components:

(a)  Manpower and training.

(b)  Communications.

(c)  Transportation.

(d)  Assessment of hospitals and critical care centers.

(e)  System organization and management.

(f)  Data collection and evaluation.

(g)  Public information and education.

(h)  Disaster response.

* * *

§ 1797.105

(a)  The authority shall receive plans for the implementation of emergency medical services and trauma care systems from local EMS agencies.

(b)  After the applicable guidelines or regulations are established by the authority, a local EMS agency may implement a local plan developed pursuant to Section 1797.250, 1797.254, 1797.257, or 1797.258 unless the authority determines that the plan does not effectively meet the needs of the persons served and is not consistent with coordinating activities in the geographical area served, or that the plan is not concordant and consistent with applicable guidelines or regulations, or both the guidelines and regulations, established by the authority.

(c)  A local EMS agency may appeal a determination of the authority pursuant to subdivision (b) to the commission.

(d)  In an appeal pursuant to subdivision (c), the commission may sustain the determination of the authority or overrule and permit local implementation of a plan, and the decision of the commission is final.

* * *

## Chapter 4.  Local Administration

### Article 1.  Local EMS Agency

§ 1797.200

Each county may develop an emergency medical services program. Each county developing such a program shall designate a local EMS agency which shall be the county health department, an agency established and operated by the county, an entity with which the county contracts for the purposes of local emergency medical services administration, or a joint powers agency created for the administration of emergency medical services by agreement between counties or cities and counties pursuant to the provisions of Chapter 5 (commencing with Section 6500) of Division 7 of Title 1 of the Government Code.

* * *

§ 1797.204

The local EMS agency shall plan, implement, and evaluate an emergency medical services system, in accordance with the provisions of this part, consisting of an organized pattern of readiness and response services based on public and private agreements and operational procedures.

* * *

§ 1797.224

A local EMS agency may create one or more exclusive operating areas in the development of a local plan, if a competitive process is utilized to select the provider or providers of the services pursuant to the plan. No competitive process is required if the local EMS agency develops or implements a local plan that continues the use of existing providers operating within a local EMS area in the manner and scope in which the services have been provided without interruption since January 1, 1981. A local EMS agency which elects to create one or more exclusive operating areas in the development of a local plan shall develop and submit for approval to the authority, as part of the local EMS plan, its competitive process for selecting providers and determining the scope of their operations. This plan shall include provisions for a competitive process held at periodic intervals. Nothing in this section supersedes Section 1797.201.

* * *

### Article 2.  Local Emergency Medical Services Planning

§ 1797.250

In each designated EMS area, the local EMS agency may develop and submit a plan to the authority for an emergency medical services system according to the guidelines prescribed pursuant to Section 1797.103.

§ 1797.252

The local EMS agency shall, consistent with such plan, coordinate and otherwise facilitate arrangements necessary to develop the emergency medical services system.

§ 1797.254

Local EMS agencies shall annually submit an emergency medical services plan for the EMS area to the authority, according to EMS Systems, Standards, and Guidelines established by the authority.

§ 1797.256

A local EMS agency may review applications for grants and contracts for federal, state, or private funds concerning emergency medical services or related activities in its EMS area.

§ 1797.257

A local EMS agency which elects to implement a trauma care system on or after the effective date of the regulations adopted pursuant to Section 1798.161 shall develop and submit a plan for that trauma care system to the authority according to the requirements of the regulations prior to the implementation of that system.

§ 1797.258

After the submission of an initial trauma care system plan, a local EMS agency which has implemented a trauma care system shall annually submit to the authority an updated plan which identifies all changes, if any, to be made in the trauma care system.

§ 1797.259

A local EMS agency that elects to implement a community paramedicine or triage to alternate destination program pursuant to Section 1840 shall develop and, prior to implementation, submit a plan for that program to the authority according to the requirements of Chapter 13 (commencing with Section 1800).

\* \* \*